James G. NEVILLE and Helen Neville, Plaintiffs,

v.

Lynn R. BRODRICK, Collector of Internal Revenue for the District of Kansas, Defendant.

Civ. A. No. T-573.

United States District Court
D. Kansas.

July 11, 1955.

Doran, Kline, Cosgrove & Russell, and Willard N. Van Slyck, Jr., Topeka, Kan., for plaintiffs.

Royce D. Sickler, Asst. U. S. Atty., Topeka, Kan., and Erwin A. Goldstein, Special Asst. to the Atty. Gen., for defendant.

WALLACE, District Judge.

The plaintiffs, James G. Neville and Helen Neville, husband and wife, bring this action against the defendant, Lynn R. Brodrick, Collector of Internal Revenue for the District of Kansas, to recover a refund of certain income taxes allegedly wrongfully assessed and collected from the taxpayers for the taxable years of 1946, 1947 and 1948, while plaintiffs were residents of Topeka, Kansas.[1] The principal question is whether certain shares of common capital stock of The Seymour Packing Company of Topeka, Kansas, (herein referred to as Seymour) transferred to each of the plaintiffs and to their son during the taxable years in dispute[2] were transferred by way of additional compensation to Neville, as ruled by the Commissioner, or as "gifts", as urged by the plaintiffs.[3]

To resolve this issue it is imperative to delve into the business history of Seymour and the personal history of the persons involved in these stock transfers.

The evidence indicates that Seymour was formed in 1893 by George C. Bowman and Mr. Seymour, Bowman's father-in-law, and was operated as a partner-

---

1. The collected deficiencies for the three years in question 1946, 1947 and 1948, were $9,919.72, $16,501.42 and $3,585.66, respectively.

2. The stipulation between parties shows the following pertinent information in regard to such transfers:

| Date of Certificate | Certificate Number | Number of Shares | Transferor | Transferee |
|---|---|---|---|---|
| Dec. 17, 1946 | 274 | 17 | G. C. Bowman | James G. Neville |
| " | 280 | 17 | J. L. Perry | James G. Neville |
| " | 272 | 17 | G. C. Bowman | Helen Neville |
| " | 279 | 17 | J. L. Perry | " |
| " | 273 | 16 | G. C. Bowman | Keith Neville |
| " | 281 | 16 | J. L. Perry | " |
| Jan. 10, 1947 | 292 | 17 | H. A. Perry | James G. Neville |
| Feb. 10, 1947 | 299 | 17 | G. C. Bowman | " |
| July 18, 1947 | 309 | 13 | J. L. Perry | " |
| Jan. 10, 1947 | 293 | 17 | H. A. Perry | Helen Neville |
| Feb. 10, 1947 | 300 | 17 | G. C. Bowman | " |
| July 18, 1947 | 310 | 13 | J. L. Perry | " |
| Jan. 10, 1947 | 294 | 16 | H. A. Perry | Keith Neville |
| Feb. 10, 1947 | 301 | 16 | G. C. Bowman | " |
| July 18, 1947 | 311 | 14 | J. L. Perry | " |
| Jan. 5, 1948 | 129 | 60 | G. C. Bowman | James G. Neville |
| " | 130 | 60 | " | Helen Neville |
| " | 131 | 50 | " | Keith Neville |

3. 26 U.S.C.A. § 22 provides in part: "*Gross Income.* (a) *General definition.* 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid * * * (b) *Exclusions from gross income.* The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * * (3) *Gifts, bequests, devises, and inheritances.* The value of property acquired by gift, bequest, devise, or inheritance. * * *"

ship until the early 1900's at which time it was incorporated. From the time of incorporation the dominant figures in the Company were Bowman and H. A. Perry. Despite Seymour's corporate form, it was for all practical purposes conducted as a two-man partnership, and it became one of the best known independent companies of its type in the United States in the buying, processing, and sale of poultry, eggs, and egg products. In 1946, Bowman and H. A. Perry, who were both over 70 years of age, decided to relinquish some of the responsibility they had carried in the firm; and, on October 5, 1946, at a meeting of Seymour's Board of Directors, they officially announced their decision. The branch managers of each of the Company's plants were each advised of this decision and were informed that plaintiff Neville, George Willi, Jr., and J. L. Perry (H. A. Perry's son) had been designated as the top men to carry on operations. At the time of this 1946 meeting, Neville and Willi had each been with Seymour for over 25 years. Neville's work was principally in the sales end of the business at Topeka, Kansas, and was a key employee at the main plant there in Topeka. Willi, for many years, had been in charge of a sales office in New York City, and controlled the sale of all of Seymour's dressed poultry; he, also, was a key employee of the Company. J. L. Perry had been active in the business since 1926, and had been president of Seymour since January of 1943.

The personal relationship between the Perrys and Neville although not intimate was friendly; and, was of the character likely to exist between shareholders-officers of a relatively small corporation and a capable loyal employee. Neville's relationship to Bowman was even closer. Like Willi, Neville's entire tenure with Seymour had been spent in the end of the business which was under Bowman's direct supervision. Bowman regarded both men highly, and consistently showed interest in their advancement in the company and interest in their personal affairs. Ofttimes he affectionately referred to both Willi and Neville as "his boys". Many times Bowman was a guest in Neville's home and such relationship was considerably closer than the ordinary employer-employee relationship. Also, from time to time Bowman mentioned he was going to do something nice for Neville.

In the late summer of 1946, just prior to the announcement by Bowman and H. A. Perry, Willi approached J. L. Perry several times and requested that he be given certain stock ownership in the Company; and, implied that unless such occurred he would no longer continue with the Company. J. L. Perry discussed this matter with Bowman. Bowman agreed that some stock should be transferred to Willi, but added that stock also should be transferred to Neville. Initially, neither J. L. Perry nor H. A. Perry would agree to transfer stock to Willi and Neville. They urged that any such stock transfer should be divided among other equally loyal and capable men in the organization rather than give such stock to just the two. However, Bowman insisted that unless the Perrys would enter into the suggested transfers to Willi and Neville that he would exercise his majority control of Seymour and remove J. L. Perry as company president. To avoid an immediate breach, the Perrys acceded to Bowman's demand. Thereafter, at Bowman's request, Willi contacted his brother, a New York attorney, to determine the tax consequences of making such transfers. Willi's brother advised that $3,000 in gifts might be made each year to as many different persons as a given donor might desire, without tax cost to either the donor or the donee. He illustrated this principle by noting that the transfers could be divided annually among Willi, his wife and son. The subsequently made transfers to Willi and Neville were made along lines similar, if not identical to, the advice given by Willi's brother, with both Bowman

and the Perrys donating shares.[4] These transfers, in all correspondence as well as oral conversations, were without exception referred to as "gifts"; and, the dividends on the stock transferred to Mr. and Mrs. Neville were deposited in joint bank accounts maintained by Mr. and Mrs. Neville in separate banks. In May, 1947, Perry, as a consequence of the sharp difference which previously had arisen between the Perrys and Bowman and believing it best that one faction should leave Seymour, entered into a "buy or sell" agreement with Bowman. Under such agreement Perry was given 15 days to set a price representing the value per share of the Seymour Packing Company stock; and, Bowman was given the option of either buying the Perry interest at that price, or selling his interest to the Perrys at such price. After consulting financial experts, Perry set the price at $176.50 per share, a price slightly less than the book value of the assets. Bowman elected to purchase.

After carefully considering the evidence and the submitted briefs, the Court has concluded that the shares of stock transferred to the plaintiffs, and their son, must be treated as taxable income to Neville, as distinguished from gifts.

Under the law the term "gifts" and "compensation for personal service" are mutually exclusive; and "a bestowal of money cannot, under the statute, be both a gift and a payment of compensation."[5] Likewise, to qualify under the "gifts" exemption, the taxpayer has the burden to show that the contested personalty was a "gift" as distinguished from a payment of compensation.[6] In the instant case the plaintiffs have failed to discharge such burden. Although considerable evidence was introduced tending to demonstrate that Bowman, in particular, had a somewhat fatherly interest in Neville and intended in spirit as well as letter to "give" Neville the stock in question, the unmistakable inference from the evidence in its entirety is that although the motive of the Perrys and Bowman may have been in a measure mixed, the primary motivating force was to compensate Neville (as well as Willi) for past faithful service; and, in addition to give "the boys" added incentive to faithfully carry on Seymour in the face of the retirement of the elder Perry and Bowman.[7] Although it has been argued that the fact the Perrys carried out their previous promise to transfer the stock when no longer interested in the future of Seymour, due to their contract to sell out, and when under no legal obligation to transfer, indicates the transfer was a "gift" in character, such is not conclusive. The Perrys, as a matter of moral obligation because they had previously promised their "partner" of long-standing that such transfers would be made, would not go back on their word; and, their following through on such previous promise in no way impugns the rationale that the original understanding and intent behind such transfers was based upon a belief that such transfers were sound

4. See footnote 2, supra.

5. Bogardus v. Commissioner, 1937, 302 U. S. 34, 39, 58 S.Ct. 61, 82 L.Ed. 32.

6. Webber v. Commissioner, 10 Cir., 1955, 219 F.2d 834, 835, 836; Botchford v. Commissioner, 9 Cir., 1936, 81 F.2d 914, 110 A.L.R. 281.

7. Even where the future good of the business is not involved, it has consistently been held that where in substance the payment is by way of additional compensation in consideration of former services rendered, such is taxable as income.

Schumacher v. United States, 1932, 55 F.2d 1007, 74 Ct.Cl. 720; Noel v. Parrott, 4 Cir., 1926, 15 F.2d 669. And, as mentioned in Bogardus v. Commissioner, footnote 5, supra, 302 U.S. at page 41, 58 S.Ct. at page 65: " * * * If the disbursements had been made by the Universal Company, or by stockholders of that company still interested in its success and in the maintenance of the good will and loyalty of its employees, there might be ground for the inference that they were payments of additional compensation. * * * "

business moves, even though the Perrys disagreed with Bowman's decision to only "give" stock to the two top men.

■ Admittedly, Neville stands in better light insofar as claiming "gift" than Willi. Neville considered himself adequately compensated for past services, had never approached Bowman, or anyone else, requesting stock, and was taken by surprise when notified of the transfers to be made. However, regardless of all this and the fact that in a legal sense the transfers were without consideration,[8] nonetheless, the "giving" was enshrouded with a motive founded upon "good business", past and future, as distinguished from pure "heartfelt" gifts from the donors.[9] Addedly, Willi's pointed approach and demand, serves to indicate, absent positive contradictory proof as to Neville, the fundamental intent and purpose of the stock owners in making the stock transfers to these equally important company officers.

Plaintiffs also challenge the reasonableness of the "fair market value" figure placed on the stock at the time of its transfer.[10] However, the plaintiffs have failed to produce evidence which establishes that the Commissioner's determination was erroneous. In fact, the Commissioner's finding is well supported from several separate and independent bits of uncontroverted evidence of record.[11]

Inasmuch as it has been determined that the transfers in question were not "gifts" and since the Commissioner's determination of fair market value was correct, it follows that plaintiffs understated their income for the year 1946 by more than 25% and therefore the Commissioner's deficiency assessment for such year was timely, and not barred by the statute.[12]

The defendant Collector is entitled to judgment. Within 15 days counsel should submit a journal entry which conforms with this opinion.

8. Cf. Bass v. Hawley, 5 Cir., 1933, 62 F. 2d 721, 723, wherein it was observed: " * * * The intent is that all receipts in whatever form that come because of labor and service, *whether payment could be compelled or not*, shall be taxed as arising from labor. That only is a gift which is purely such, not intended as a return of value or made because of any intent to repay another what is his due, but bestowed only because of personal affection or regard or pity, or from general motives of philanthropy or charity. Those payments made because of past services, *but over and above what was contracted and compellable to be paid*, have been called additional compensation and bonuses, and are taxable income to the recipient." (Emphases supplied.)

9. Distinguish Jones v. Commissioner, 3 Cir., 1929, 31 F.2d 755; Blair v. Rosseter, 9 Cir., 1929, 33 F.2d 286, 287; Abernethy v. Commissioner, D.C.Cir., 1954, 211 F.2d 651; Schall v. Commissioner, 5 Cir., 1949, 174 F.2d 893; and, Mutch v. Commissioner, 3 Cir., 1954, 209 F.2d 390, wherein the future of the business or work to be done by the recipient was in no way involved, and the gifts were made in recognition of past faithful service.

10. The Commissioner ruled that the fair market value of the shares transferred in 1946 and 1947 was $176.50 per share; and, $50.07 in 1948 following a four-for-one-split.

11. (1) In 1947 when the Perrys and Bowman entered into the "buy or sell" agreement the value placed on the stock was $176.50 per share. (2) When H. A. Perry died in February of 1947, the value placed on such shares for estate tax purposes was $176.50 per share.

12. "(c) *Omission from gross income.* If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed." 26 U.S.C.A. § 275.