**James G. NEVILLE and Helen Neville, Appellants,**

v.

**Lynn R. BRODRICK, Collector of Internal Revenue for the District of Kansas, Appellee.**

**No. 5273.**

United States Court of Appeals Tenth Circuit.

July 26, 1956.

264

Willard N. Van Slyck, Jr., Topeka, Kan. (M. F. Cosgrove and Doran, Kline, Cosgrove & Russell, Topeka, Kan., were with him on the brief), for appellant.

David O. Walter, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Walter R. Gelles, Attys., Dept. of Justice, Washington, D. C., and William C. Farmer, U. S. Atty., Topeka, Kan., were with him on the brief), for appellee.

Before BRATTON, Chief Judge, PHILLIPS, Circuit Judge, and ROGERS, District Judge.

BRATTON, Chief Judge.

This was an action instituted by James G. Neville and Helen Neville against Lynn R. Brodrick, Collector of Internal Revenue for the District of Kansas. James G. Neville and Helen Neville were husband and wife, and Keith Neville was their son. During the years 1946, 1947, and 1948, certain shares of stock issued by Seymour Packing Company, hereinafter referred to as the Seymour Company, were delivered to James G. Neville, hereinafter referred to as the taxpayer; certain shares were delivered to Helen Neville; and certain shares were delivered to Keith Neville. In their income tax returns for such years, the taxpayer and his wife did not include the stock as taxable gain. The Commissioner of Internal Revenue determined that the stock was issued and delivered as additional compensation for services rendered for the Seymour Company and therefore was taxable. Deficiency assessments were imposed. The deficiency taxes together with accrued interest thereon were paid and this suit was instituted to recover refunds. Issues were joined upon two questions. One was whether the stock represented gifts or additional compensation for services rendered, and the other was the fair market value of the stock. The court resolved both issues in favor of the Collector, 133 F.Supp. 716. Judgment was entered accordingly and the appeal therefrom followed.

■ Section 22(a) of the Internal Revenue Code of 1939, 53 Stat. 9, 26 U.S. C.A. § 22(a), in presently pertinent part defines gross income as including "gains, profits, and income derived from  *  *  compensation for personal service  *  *  of whatever kind and in whatever form  *  *  *." And section 22(b) (3) exempts from taxation under the chapter the value of property acquired by gift. While sometimes difficult of application, the statute draws a clear distinction between compensation for services rendered or to be rendered and gifts, the former being taxable and the latter exempt. And under the terms of the statute a single bestowal of money or stock cannot be both. Bogardus v. Commissioner, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32.

■■ A payment in cash or the issuance of stock may constitute additional compensation for services rendered or to be rendered within the purview of the statute although the payment is made or the stock is issued voluntarily and without legal obligation. If a payment is made in cash or stock is issued with the intention and purpose of making more complete requital for services rendered or to be rendered, it is subject to tax in the hands of the recipient even though full legal acquittance has been or is to be given otherwise. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed. 918; Webber v. Commissioner, 10 Cir., 219 F.2d 834; Peters v. Smith, 3 Cir., 221 F.2d 721. And if an employer issues and delivers to an employee stock for the primary purpose of vesting in the employee a proprietary interest in the business as an inducement for the rendering of better service to the employer, the employee receives compensation for personal services within the meaning of section 22(a). Commissioner of Internal Revenue v. Lo Bue, 351 U.S. 243, 76 S.Ct. 800.

■ An employer may make a gift to an employee without rendering it taxable but the payment of an additional sum in cash or the issuance of stock in lieu of cash by an employer to an employee carries with it a legal presumption that the transaction constitutes compensation for services as distinguished from a gift, within the meaning of the statute. Willkie v. Commissioner, 6 Cir., 127 F.2d 953, certiorari denied 317 U.S. 659, 63 S.Ct. 58, 87 L.Ed. 530; Carragan v. Commissioner, 2 Cir., 197 F.2d 246; Wallace v. Commissioner, 5 Cir., 219 F.2d 855.

■ Whether an amount received by an employee either in cash or stock constitutes compensation for services or a gift depends upon the intention of the parties, principally that of the payor or the party issuing or causing the issuance

of the stock; and in a case of this kind the taxpayer has the burden of proving a gift, including the donative intent. Webber v. Commissioner, supra.

■ Upon the conventional transfer of stock, there is an element of economic benefit to the recipient thereof. But if the motivating purpose of the transaction is that of a gift, such economic benefit is incidental and not compensatory, within the intent and meaning of section 22, supra. And if the transfer is intended as a gift, it is a gift nonetheless because inspired by a feeling of gratitude for past or anticipated future services. Bogardus v. Commissioner, supra.

■ It is not the province of this court to retry the critical issue whether the stock issued to the taxpayer and to his wife represented additional compensation or gifts or to substitute its conclusion for that of the trial court in respect to such issue. But it is the province and duty of this court to determine whether or not the finding of the trial court respecting such issue is supported by substantial evidence or is against the weight of the evidence and therefore clearly erroneous. O'Malley v. Ames, 8 Cir., 197 F.2d 256.

■ It is in the light of these well-recognized general rules for guidance that the parties present the question whether the evidence disclosed that the stock was issued as additional compensation for services previously rendered and as an inducement for services thereafter to be rendered or as gifts. The stipulation filed in the cause and the evidence adduced upon the trial, considered together, tended to establish these facts. The Seymour Company was engaged at Topeka, Kansas, in the business of processing, packing, and selling poultry, eggs, and egg products. The company was formed as a partnership in 1893, and was incorporated in 1902, or thereabouts. George C. Bowman, and his father-in-law, Mr. Seymour, were the partners. Bowman and H. A. Perry became the major stockholders of the corporation. Bowman was in charge of the financial, procurement, and sales functions of the business, and Perry handled plant management and production activities. For many years, the business relationship between the two was completely harmonious and the business was operated much as though it was a two-man partnership. The taxpayer was employed by the company from January, 1921, until June, 1950. During the years 1921 to 1944, he was traffic manager and produce buyer. In 1944, he was elected vice president and sales manager and served in that capacity until 1946, when he was elected executive vice president. In 1947, he was elected president of the company and served in that capacity until the termination of his employment in June, 1950. And he was a director of the company from the late 1920's until the termination of his employment. During all of this time, he worked primarily under the direction of Bowman and a warm relationship developed between them, both business-wise and personal. The taxpayer's family consisted of himself, his wife, and his son, Keith; and they resided in Topeka. Helen Neville was never employed by the Seymour Company. Keith Neville was born in 1922, and his only employment by the company prior to 1948, consisted of work as a laborer at the company's buying plant in Lawrence, Kansas, during the 1940–1941 school year while he was a student at the University of Kansas, and work as a laborer for a period of about five months in the year 1943. George Willi resided in New York. He began working for the Seymour Company in 1918, handling its sales office in New York; and from sometime in the 1920's until June, 1950, he was a director and vice president. The relationship between Bowman and Willi was of the same general nature as that existing between Bowman and the taxpayer. Bowman valued highly the business ability of the taxpayer and Willi; he had unlimited confidence in them; and he nurtured the personal friendship with them. He had two daughters but no sons, and in conversations or business negotiations he sometimes referred to the taxpayer and Willi as his boys. Bowman was also very friendly with the wife and son of the taxpayer, and he entertained a like cordial feeling for the

wife and son of Willi. On more than one occasion, Bowman stated to the taxpayer and his wife that something very nice was going to be done for them—something which would please them very much. And he made statements of like import to Willi. J. L. Perry was the son of H. A. Perry. He began working for the Seymour Company in 1926 in the production department under the supervision of his father; he remained in that service until 1943 when he was made president; and he continued as president until May, 1947, when the Perry interests were purchased by Bowman. Due to advanced age, Bowman and H. A. Perry determined to withdraw at least in part from active participation in the business of the Seymour Company and to turn the management thereof over to J. L. Perry, then president, the taxpayer, then vice president, and Willi, then vice president. Formal announcement of such determination was made at a meeting of the board of directors in October, 1946; the taxpayer was advanced to the position of executive vice president; and all branch managers were advised of such action. During the summer of 1946, Willi approached J. L. Perry with a request that 300 shares of stock in the Seymour Company be issued to him. The request was accompanied with the implication that if the stock was not received Willi would leave the company. Willi also brought the matter to the attention of Bowman. And in the fall, J. L. Perry discussed it with Bowman. Bowman expressed a willingness to transfer stock to Willi but stated that he felt the taxpayer should share equally with Willi in any stock transfer. H. A. Perry and J. L. Perry assumed a negative attitude. They entertained the view that other equally loyal men in the organization should share in any issuance of stock. But Bowman made it clear that unless the Perrys agreed to the suggested issuance of stock to Willi and the taxpayer, he would exercise his majority control of the corporation to effectuate the removal of J. L. Perry as president. In view of that situation, the Perrys decided to go along with Bowman's plan of distribution. In the meantime, Bowman mentioned to Willi that gifts of stock to him and the taxpayer were under consideration and asked or suggested that Willi obtain from his brother, an attorney in New York City, legal advice respecting the manner in which the transaction could be handled within the framework of revenue legislation. Willi sought and obtained written advice from his brother. The brother outlined the manner in which issuance of stock as gifts could be made with the most favorable tax consequences. Bowman consulted Peat, Marwick, Mitchell & Company, the firm of certified public accountants servicing the account of the Seymour Company, respecting the gift tax aspect of the transaction. And he directed an attorney to inquire of J. L. Perry whether he intended to complete the gifts of stock. The attorney made the inquiry and J. L. Perry replied in the affirmative. Stock was issued on five separate dates, part to the taxpayer, part to his wife, and part to his son. The stock was issued out of the individual stock holdings of Bowman, H. A. Perry, and J. L. Perry. None was issued from stock of the corporation. During the years 1946, 1947, and 1948, the taxpayer received from the Seymour Company as salary, flat bonus, and Christmas bonus, $17,038.71, $30,250.18, and $26,048.12, respectively. He considered such payments as full and adequate consideration for the services he rendered for the corporation, and did not request or suggest any further compensation therefor. He knew nothing of the plan to issue any stock to him and members of his family until he was told by J. L. Perry. At about the same time Bowman also told him of the plan. It came as a complete surprise to him. The transaction was consistently referred to as gifts. Bowman referred to it as gifts. Bowman was director of a bank in Topeka and maintained a close personal relationship with the president of the bank. He told the president of the bank that he had been giving the taxpayer and Willi some stock. After the matter of the issuance of the stock was settled between Bowman and the Perrys by the Perrys agreeing to follow the pattern set by Bowman, J. L. Perry considered the is-

suance of the stock as gifts and he referred to the transaction in that manner. In one letter transmitting to the taxpayer part of the stock, J. L. Perry stated that a balance of 40 shares was due in 1948 "to complete our gift". A letter of like import was written to Willi. No one testified categorically that the purpose of the issuance of the stock was to compensate the taxpayer for past or future services to the company. No one referred to the stock as representing compensation for services. And none of the parties ever claimed or sought any tax benefits as business expense or otherwise on account of the stock representing compensation. Viewed in its entirety, the evidence obliges the conclusion that the motivating purpose of the issuance of the stock was to make gifts to the recipients thereof as distinguished from additional compensation for services rendered or to be rendered for the corporation, and that the finding of the trial court otherwise was clearly erroneous.

Inasmuch as the stock represented non-taxable gifts, it is unnecessary to explore the question of value.

The judgment is reversed and the cause is remanded with direction to enter judgment for plaintiffs.