STEWART KRUEGER, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY, Defendant and Appellee.

No. R-62-206.    Decided October 28, 1963.

*Rivera Zayas, Rivera Cestero & Rúa,* and *Antonio Montalvo Nazario* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question for decision in this case is of vital importance for the economic development program of Puerto Rico in connection with which the Commonwealth Government has provided, as the main incentive for promoting the establishment of manufacturing and hotel enterprises in the country, a tax exemption system which includes the exemption of dividends paid to residents herein by those enterprises enjoying such tax exemptions, provided such dividends accrue from industrial development income.[1] Appellee Secretary of

---

[1] Industrial development income includes:

(1) The net income derived from the production of a manufactured product that gives rise to the exemption granted to the business.

(2) The net income derived from the operation of tourist hotels and 50 percent of the income from the operation of commercial hotels.

(3) The net income from property devoted to industrial development. Section 2(a) and (d) of the Industrial Incentive Act of Puerto Rico

the Treasury insists that dividends paid to appellant Stewart Krueger on shares issued to him by the manufacturing corporation Hickok of Puerto Rico, Inc., hereinafter referred to as Hickok, constitute compensation for services rendered as general manager of that enterprise, rather than dividends, and that, therefore, appellant is bound to pay tax thereon.

The evidence was introduced by the taxpayer. Appellee relied on the presumption of correctness of his administrative determinations.

Stewart Krueger, former employee of Hickok Manufacturing Company, in charge of an elastic products factory in the United States with an annual salary of $6,500, was sent to Puerto Rico in 1952 to establish a leather belt factory. He was designated as its general manager with the same salary he was earning in his previous employment. He was in charge of selecting and training the personnel and of the manufacture and shipment of the product. Krueger was not responsible for the sales nor for the accounting. His compensation was not increased until 1961 when his salary was fixed at $8,000 a year. His duties and obligations did not change basically between 1952 and 1959. In his previous employment in the United States he was at the head of a factory of 125 employees and warehouses, while in Puerto Rico his responsibilities were less because it was a smaller factory, with shipments to only one destination; in other words, that the whole production was sold to only one buyer. He accepted coming to Puerto Rico under an agreement with Hickok that if he decided to stay in Puerto Rico he would become co-owner of Hickok of Puerto Rico, Inc. This corporation was granted a tax exemption in 1952 pursuant to the provisions of the Puerto Rico Industrial

of 1954 (13 L.P.R.A. § 242(a) and (d)), and § 2(a) and (d) of the Industrial Incentive Act of Puerto Rico of 1963—Act No. 57 of June 13, 1963 (1 Legislative Service of Puerto Rico 427 and 428).

Tax Exemption Act of 1948 (13 L.P.R.A. §§ 221–51, 1955 ed.), as amended. In 1960 that corporation elected to take the exemption granted under the provisions of the Industrial Incentive Act of Puerto Rico of 1954, pursuant to § 7 thereof (13 L.P.R.A. § 247), and the proper tax exemption conversion was duly approved on November 4, 1960. According to Krueger's testimony, it was not until December 1955 that he *purchased with his own money* the 250 shares denominated "Special Class A" stock authorized by the amendment of December 27, 1955 to Art. 4 of the certificate of incorporation of Hickok, plus 12 of the 250 common shares authorized by that corporation, by paying the par value for both classes of shares. Hickok also authorized the issuance of 500 preferred shares with a par value of $49 each, with the right to a preferred annual dividend of 6 percent, but the latter were redeemed after they were issued. According to Art. 4 of the Hickok certificate of incorporation, such "Special Class A" shares (a) were not entitled to vote; (b) were entitled to a 5 percent dividend of the aggregate net earnings of the corporation as of the last day of the fiscal year ending December 31, 1955, divided by 250, and for and during the fiscal year beginning January 1, 1957, and for and during each subsequent year, to a dividend equal to 5 percent of the applicable net earnings as of the close of the last preceding fiscal year, divided by 250; (c) that article also provided that in addition to such dividend the board of directors may, in its absolute discretion, pay to the "Special Class A" stockholders, for any fiscal year subsequent to December 31, 1955, such additional dividends as the board of directors may determine; (d) the board of directors may at any time, from time to time, redeem all or any part of the "Special Class A" stock by payment to the holder or holders, an amount equal to the par value plus any unpaid annual and special dividends thereon, together with any additional dividends declared and remaining un-

paid; and (e) in case of a liquidation or dissolution of the corporation, the holder of each "Special Class A" share shall be entitled to participate in the remainder of the corporation's assets after paying the amount corresponding to the preferred stock.

The income tax returns prepared and filed by Hickok of Puerto Rico, Inc., and admitted in evidence show, the following:

| YEAR | PROFIT | LOSS | SURPLUS |
|------|--------|------|---------|
| 1952 | | $19,905.51 | |
| 1953 | $29,312.26 | | $ 9,406.75 |
| 1954 | 48,634.39 | | 58,041.14 |
| 1954–55 | | | |
| (½ year) | 33,625.16 | | 91,666.30 |
| | | | less $1,470 dis- |
| | | | tributed among |
| | | | stockholders |
| | | | 90,196.30 |
| 1955–56 | 47,420.88 | | 137,617.18 |

In January 1956 a dividend of $6,986 was de-
clared on the "Special Class A" shares, plus $1,176
on other shares, which reduced the surplus to ........ | 129,455.18

| 1956–57 | | 38,929.88 | 90,525.30 |

Dividends of $10,030 were paid this year, $8,854
on "Special Class A" shares, and the remainder on
others, which reduced the surplus to ....................... | 80,495.30

| 1957–58 | $4,380.81 | | |

plus other income of $22.28, less
$2,272.28 distributed among the
stockholders, leaving a surplus of | 82,626.11

| 1958–59[2] | $42,615.13 | | 125,241.24 |

less $2,500 of dividends paid to
Krueger | 122,741.24

[2] Subsequent to the declaration of income for this fiscal year, Krueger was paid $8,000 as additional dividends, since he reported in his income return for calendar year 1959 the sum of $10,500 in dividends received from Hickok.

The first dividend declared in January 1956 on the "Special Class A" stock was paid in March of the same year. According to the testimony of certified public accountant Ismael Rodríguez, all of these dividends were declared pursuant to resolutions adopted to that effect by the board of directors of Hickok. Appellant was and has always been a minority holder of voting shares of Hickok, that is, he has been the owner of only 12 out of the 250 common voting shares of the corporation.

Briefly, Krueger received from Hickok dividends on the "Special Class A" stock which he acquired from the corporation in the amounts of $6,986, $8,854, and $10,500 during the years 1956, 1957 and 1959. Such dividends were duly reported by Hickok's board of directors pursuant to the pertinent provisions of Art. 4 of the certificate of incorporation of Hickok, and were paid out by Hickok from the accumulated surplus of its exempt operations, wherefore Krueger claimed that he was not bound to pay tax thereon according to § 6 of the Industrial Tax Exemption Act of 1948 (13 L.P.R.A. § 227, 1955 ed.).[3]

---

[3] Subdivision (d) of § 4 *supra* provides as follows:

"D. Each share of special class A stock outstanding at any time during the calendar year 1956 shall be entitled to a dividend (hereinafter referred to as the 'special dividend'), payable as and when declared by the Board of Directors, equal to 5 percent of the aggregate net earnings of the corporation as of the last day of the fiscal year ending December 31, 1955, divided by 250. For and during the fiscal year beginning January 1, 1957, and for and during each subsequent fiscal year, each share of special class A stock outstanding at any time during such fiscal year shall be entitled to a dividend (hereinafter referred to as the 'annual dividend'), payable as and when declared by the Board of Directors, equal to 5 percent of the applicable net earnings of the corporation as of the close of the last preceding fiscal year divided by 250, but only in the event that there are applicable net earnings at the close of said previous fiscal year.

"In addition to the annual dividend payable as above provided, the Board of Directors may, in their absolute discretion, for and during any fiscal year subsequent to December 31, 1955, pay to the special class A stock such additional dividends (hereinafter referred to as 'additional dividends') as the Board of Directors may determine."

Feeling aggrieved by notification by appellee of the deficiency of $8,427.25 on the ground that such payments were not dividends but were salaries or additional compensation for services rendered on which no tax exemption may be claimed, appellant sued appellee requesting that such deficiency be set aside. Appellee answered admitting certain alleged facts and denying, briefly, that the payments in question were dividends. The trial court, after determining in part the facts previously recited and pointing out that the dividend payments amounted to $26,340 on the basis of an investment of $250, concluded that such payments were actually bonuses or compensation for appellant's services as manager of the leather-processing factory and that he had no right to claim any exemption on the sums so received under § 22(a) of the Income Tax Act of Puerto Rico,[4] and lastly, that the deficiencies are valid and appellant's motion shall not prevail.

■■ Appellant alleges that the trial court erred in concluding that those payments were bonuses or compensation paid for his services, relying exclusively on the presumption of correctness of the determinations of the Secretary of Treasury, without the latter having introduced any evidence in support of the correctness of his tax determinations. This assignment is based only on the doctrine announced by this

---

[4] Section 22(a) (13 L.P.R.A. § 3022(a)), provides that:

"(a) General Definition.—'Gross Income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including payment for services as an officer or employee of the Commonwealth of Puerto Rico, of any State of the Union, of the United States, or any political subdivision, or any agency or instrumentality of any of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the possession or use of or interest in such property; also from interest, rent, dividends, partnership profits, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

Court in *Carrión* v. *Treasurer of P.R.*, 79 P.R.R. 350 (1956), and reiterated in *Ramón* v. *Sec. of the Treas.*, 84 P.R.R. 423 (1962), and later in *Reyes* v. *Sec. of the Treas.*, 84 P.R.R. 574 (1962), to the effect that by virtue of such presumption the Secretary of the Treasury is not bound to furnish evidence in support of the correctness of his tax determinations, but once reasonable and trustworthy evidence is introduced in support of the taxpayer's contentions, such presumption is overcome and the Secretary is bound to present evidence in support of his contentions. The burden of persuading the trier rests with the taxpayer. Although the latter's evidence "does not have to be extraordinarily persuasive and authentic or clear, strong and convincing, at least it should be within the degree and measure of persuasion required in all other civil cases." *Collazo* v. *Sec. of the Treasury*, 82 P.R.R. 629, 635 (1961). In the light of this doctrine, appellant maintains that he introduced creditable, reasonable and uncontroverted evidence that Krueger was a bona fide stockholder of Hickok, that the dividends paid to him were duly declared and paid from the surplus of that corporation, and that Hickok's stock was sold to him under a previous agreement that it would be done if he decided, as he did, to remain in Puerto Rico.

Appellee maintains that the agreement between Hickok and appellant for the acquisition of special shares constitutes an employment contract and not a bona fide investment contract; that Hickok's intention in selling shares to appellant was to grant him compensation. These assertions are based on the contention that the dividends paid on such shares constituted an unreasonable and excessive interest in proportion to the investment; that the sale of stock was made as a compensatory incentive to induce a trustworthy person with many years of experience to move with his family to Puerto Rico in order to establish a new industry; that the unreasonableness of the interest paid on the special

stock becomes evident if compared with the interest provided for the preferred shares in the certificate of incorporation of Hickok. The latter allegation does not have much weight in view of the broad powers granted by law to corporations to create and issue all kinds of shares with different classes of rights, conditions, benefits and privileges (14 L.P.R.A. §§ 1102 and 1501).

It is a well-settled doctrine that the amount of dividends to be paid, and whether or not they are declared, are questions resting primarily on the sound discretion of the directors. Ballantine, Corporations, rev. ed., § 231, p. 552, and § 76, p. 192, and cases therein cited. However, in order to determine, for tax purposes, whether a payment constitutes in fact the payment of a dividend or of a compensation, the parties' intention is a controlling factor. To that effect, the courts are not limited to considering the mere form of making the payment, but they should look into the substance of the payment to ascertain the true nature of the transaction involved. While it is true that payments made in discharge of a contractual obligation may be considered dividends, as stated in *Beneficial Corporation* v. *Commissioner*, 18 T.C. 396 (1952), it is no less true that not all payments made are necessarily dividends, and, therefore, such basis for payment does not preclude determination, in a case such as this, of the exact nature of the payments in question. For this reason, in *Albert Russel Erskine*, 26 B.T.A. 147 (1932), the court considered as compensation the difference between the market price at which a corporation purchased a number of its own shares of stock and the nominal price at which it sold them to one of its executives, in consideration of an agreement with him as a condition for his employment. It was also held in that case that the payment to an employee of the dividends paid on the stock while they were held in the corporation's treasury also

constituted compensation. In *Commissioner* v. *Lo Bue*, 351 U.S. 243 (1956), it was held that the difference between the price of $1,700 paid by a person to the corporation of which he was an employee for shares acquired under a stock option plan and their market value of $9,930, constituted compensation for personal services and was not a gift, and should have been included as part of the employee's income for income-tax purposes. It was held that there was no provision in § 22(a) of the Federal Income Tax Act[5] to indicate that its broad coverage should be narrowed because of the employer's intent to obtain more efficient service from an employee by granting him an interest in the business; that when profits are transferred by an employer to an employee to secure better services, they plainly constitute compensation, and that it makes no difference whether compensation is paid in stock or cash; that the payments in this case could not be considered a gift since they have not the slightest indication of disinterested generosity, but that they were designed to achieve more profitable operations by providing an incentive to the employees to promote the growth of the company by permitting them to participate in its success. In *United States Steel Corporation*, 2 T.C. 430 (1943), the court considered as additional compensation the dividends on stock of the employer which the latter credited toward the payment for such stock by its employee under a stock subscription plan, under which the stock would be issued to the employee when it was fully paid. Under this plan the subscription could be cancelled and the payments made, minus the dividends, which would be refunded at the request of the subscribing employee upon ceasing in the employment when discharged for cause, or when failing

---

[5] Section 22(a) of the Federal Internal Revenue Code of 1939, 53 Stat. 9, as amended, 53 Stat. 574, defines gross income as "gains, profits and income derived from . . . compensation for personal service . . . of whatever kind and in whatever form paid."

to resume employment when so requested. The court decided that the agreement in question was not in fact a stock subscription plan; that as to the nature of the payments of dividends, the intention of the parties was of primary importance; that it is necessary to determine the substance of the plan rather than its form; and that under the circumstances stated, it was necessary to decide whether the payments in question constituted additional compensation.

The cases of *Erskine*, *Lo Bue*, and *United States Steel Corporation*, *supra*, are clearly distinguishable from the instant case, since the first two dealt with an entirely different question, that is, the difference between the stock's market price and the price at which it was sold to the employees, while the third dealt with dividends paid to an employee on stock which was not yet issued in his favor and which was subject only to a so-called stock subscription plan which actually was no such thing, since it could become ineffective at any moment.

■ The case of *Paul E. Watson*, 60255 P-H Memo TC-1960 (Vol. 29, p. 1563), is similar to the case at bar. In this case the question was whether certain payments made on shares sold to some executive-employees of a railway corporation, partly by other stockholders and partly by the company directly, and while the stock was subject to repurchase by the corporation, at the price fixed in the agreement when the status of the executive ended as employee because of death or other cause, were dividends or additional compensation. It was decided that the payments in question were dividends and not additional compensation. The general rule announced in this case is that the determination as to the taxable nature of monies paid, whether gifts, dividends or compensation, depends largely on the real intent of the parties, particularly the payer, as disclosed by the facts and circumstances surrounding such payments. *Bogardus* v. *Commissioner*, 302 U.S.

34 (1937); *Neville* v. *Brodrick*, 235 F.2d 263 (1956); *Patent Button Co.* v. *Commissioner*, 203 F.2d 479 (1953). In this case the court concluded that the stock was bona fide stock, that the sale thereof to executive employees was not a scheme in a manner which would enable them to escape tax by distributing the stock among different relatives. On the contrary, the sale of the stock to employees was a bona fide sale and it was intended that they would acquire a participation in the corporation, and there was not a causal connection between the dividends paid and the corporation's determination of the compensation of the employees which had been previously considered as being fair and reasonable.[6]

In the case under consideration the compensation of $6,500 a year paid to appellant has not been questioned. The reason adduced to sustain the dividends paid to appellant on the "Special Class A" shares was that they constituted additional compensation in interest at $35 per dollar invested, it being significant that appellant was the only owner of this class of shares. However, if we compare Hickok's surplus with the amount of outstanding common shares, it will be noted that the average interest payable thereon was about 29 times its par value, and that this stock was not subject to redemption at its par value as was the former.[7] This situation is not surprising nor peculiar to this case, but it is unques-

---

[6] See, also, the case of *Neville* v. *Brodrick, supra,* and the annotation *Issuance or transfer of stock to corporate officer or employee as subject to federal income tax,* 72 A.L.R.2d 1329; 1 Washington & Rothschild, *Compensating the Corporate Executive* 52 (3d ed., The Ronald Press Company, 1962); 4 Mertens, Law of Federal Income Taxation, §§ 25.64 to 25.68 (rev. 1960); Guterman, *Substance* v. *Form in the Taxation of Personal and Business Transactions,* N.Y.U. 20th Inst. of Fed. Tax. 951; *Phantom Stock Plans,* 76 Harv. L. Rev. 619; Hoffman, *Tax Influences in Shaping the Executive Pay Package,* 40 Taxes 386.

[7] The table copied above, showing the profits, losses and surplus of Hickok during the seven years between 1952 and 1958–1959, indicates that the average surplus during the seven years in question was more than $20,000. Since the investment in common shares amounted to $500, the average interest per dollar invested in such shares was about $29.

tionably the result of two circumstances which may arise in cases of tax-exempt manufacturing enterprises in Puerto Rico, that is, that (1) that they may be organized with a small authorized capital and raise the additional and necessary working capital through the sale of preferred stock which is later redeemed, as in this case, or through promotional government loans, and (2) through good administration consisting in efficient manufacture and advantageous sales of their entire production they may realize large profits tax free, thereby increasing their surplus in unusual amounts.

██ Ordinarily, in a case of a nonexempt corporation it can be argued that creating a special class of shares for an executive of the enterprise instead of giving him participation therein through limited dividend shares, such as preferred or common shares (which in turn enables him to participate not only in the profits but also in the risks of the business), is indicative of the corporation's intention to pay him additional compensation for his services. However, there is an explanation in the cases of corporations such as Hickok to warrant the creation of such special class of shares and their issuance to a particular person who is also an employee and common stockholder of Hickok and who pays the full amount thereof to the enterprise, as Krueger did. He is a person who is not a capital investor and is a bona fide resident of Puerto Rico. The rest of the stockholders are unquestionably residents of continental United States. Hence, it is not convenient for the latter to receive Hickok's dividends periodically since such payments would be taxable in Puerto Rico as well as at the place of residence of those stockholders.[8] Therefore, it is necessary for the latter, con-

---

[8] Under the Puerto Rico Industrial Incentive Act of 1954, the exemption of dividends is limited to bona fide residents of Puerto Rico and to nonresidents not bound to pay in any jurisdiction outside of Puerto Rico any tax on income derived from any source within Puerto Rico. A similar

trary to appellant's interest, not to receive dividends on Hickok's common shares, but, on the contrary, to allow the latter's earning to accumulate[9] in order to liquidate it at the proper time or to sell their shares for their approximate book value and thus reduce their tax liability to the payment of the tax on the resulting capital gain. Obviously, the holding of preferred shares with such a limited dividend would not have complied fully with the original agreement between Krueger and Hickok to the effect that the former "could become co-owner or receive shares of the company if I remained permanently." Situations such as these are precisely those which may be anticipated without their being in conflict with the broad and beneficial purposes of the legislation which since 1947 provides tax exemption to certain enterprises and particularly to manufacturing operations. According to the declaration of policy of the Industrial Tax Exemption Act of 1948 *supra*, one of the purposes of the Legislative Assembly in enacting the same has been "For the most efficient employment of our human resources, the most fruitful utilization of our limited natural resources,

provision was included in § 6 of the Industrial Tax Exemption Act of 1948, *supra*.

The Puerto Rico Industrial Incentive Act of 1963 includes a similar provision, except that under this Act it is added that in the case of persons not residing in Puerto Rico no tax shall be collected on dividends or profits derived from a corporation or partnership that is an exempt business in the Commonwealth (1) when they cannot take, as a deduction from the income or as a credit against the tax payable in the country of their residence, the said dividends or profits, and (2) in case they can only take them partially as a deduction or credit, then the exemption of the dividends shall apply only to that portion of the income tax which may be levied in Puerto Rico on such dividends or profits which may be deductible or creditable in the country where the stockholders reside. 13 L.P.R.A. § 243(a)(1) and (2). Section 3(a)(1), (2), (3) and (4) of Act No. 57 of June 13, 1963, *supra*, footnote 1.

[9] The accumulation of profits is permissible in the case of tax-exempt corporations under the provisions of the Acts cited in footnote 8. This was definitively made clear by Act No. 58 of June 17, 1963 (1 Legislative Service of P. R. 461).

the assurance of ample employment opportunities for our labor masses, the remedying of the unemployment arising from the inability of our agriculture to absorb all the available hands, it is necessary that the Government of Puerto Rico shall prepare to wage the battle of production, *by providing individuals and entities with the encouragement and facilities that will render commercially attractive the establishment of new industries in Puerto Rico, as well as the development of those industries already in operation which are capable of expansion.*" (Italics ours.) 13 L.P.R.A. § 221, 1955 ed.

■ In the declaration of policy of the Industrial Incentive Act of 1954, the Legislative Assembly informed that "the industrial and the tourist aspects of the economic development program have used as an indispensable promotion tool the incentive to investors and manufacturers of the industrial tax exemption benefits made available by the Legislature of Puerto Rico under Act No. 184 of May 13, 1948, as amended to date, with the result that under such program direct employment has been provided to more than 20,000 workers in manufacturing and tourist enterprises while employment in other pursuits, such as necessary services of transportation, communications, trade and the professions, has been made available to an approximate and additional equal number of persons." 13 L.P.R.A. § 241, annotations. See footnote 8 of *Elgee, Inc.* v. *Secretary of the Treasury*, 88 P.R.R. 403 (1963). Evidently, it was not sufficient to provide the incentive of exempting the gains of corporations and partnerships to obtain the establishment of new and additional manufacturing and hotel enterprises, but it was necessary to provide a similar incentive for individuals residing in Puerto Rico for three fundamental reasons, namely, to induce them to establish such enterprises at their expense; to make capital investments therein, and, no less important,

to obtain, as is evident in the case at bar, the transfer of persons with the necessary knowledge and experience from their country to Puerto Rico to establish and direct unknown operations, thus conveying their knowledge and technique to hundreds of Puerto Rican young people capable and desirous of acquiring them. Industrial enterprises are not mere automatic machines which work by themselves. It is man's talent and experience which initiates, develops and directs them and insures their successful operation, and when there are none in an underdeveloped country, it is necessary to find the way to attract them. In the tax system prevailing in a free enterprise system such as ours we have found that one effective means to accomplish this has been through the use of the tax exemption prevailing in Puerto Rico[10] under the economic development program authorized by the Legislature and the Executive Power of the Commonwealth, supervised by the latter and under the direction of the Economic Development Administration and its subsidiary, the Industrial Development Company of Puerto Rico, to promote aggressively the establishment of manufacturing enterprises in this country. Therefore, we conclude that the presumption of correctness of the Secretary of the Treasury's determination in the instant case was overcome when the appellant presented, as he did, trustworthy and reasonable

---

[10] The most eloquent proof of the positive results obtained under that program appears from the following statistics:

(1) The average income in Puerto Rico has increased from $150 to $700 since the commencement of the program.

(2) About 900 factories have been established under this program, some $770 million dollars of private capital and $62 million dollars of government funds have been invested in its accomplishment.

(3) Such factories provide direct and indirect employment to some 120,000 persons with an annual payroll of $175 million dollars. Citation: Annual Report for 1962 of the Industrial Development Company of Puerto Rico, at p. 5, and Sunday San Juan Star Magazine of October 13, 1963, at p. 6.

evidence in support of his contention that the controverted payments were dividends and not compensation.

For the reasons stated, the judgment in this case will be reversed and another rendered instead sustaining the complaint and, consequently, the deficiencies challenged in the complaint are set aside.