STEWART KRUEGER, demandante y recurrente, *v.* SECRETARIO DE HACIENDA, demandado y recurrido.

*Número:* R-62-206 *Resuelto:* 28 de octubre de 1963

346

*Rivera Zayas, Rivera Cestero & Rúa* y *Antonio Montalvo Nazario,* abogados del recurrente; *J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Consideramos en este caso una cuestión de importancia capital para el programa de desarrollo económico de Puerto Rico en relación con el cual el gobierno estatal ha provisto, como principal atractivo para fomentar el establecimiento de empresas manufactureras y hoteleras en el país, un sistema de exenciones contributivas que incluye la exención de dividendos pagados a residentes del país por las empresas beneficiadas con tal exención contributiva, siempre y cuando que tales dividendos provengan del ingreso de fomento industrial.[1] Insiste el recurrido Secretario de Hacienda que dividendos pagados al recurrente Stewart Krueger, sobre acciones emitidas a éste por la corporación manufacturera, Hickok of Puerto Rico Inc., en lo sucesivo designada Hickok, constituyen pagos de compensación por servicios prestados como gerente general de dicha empresa, y no tales dividendos, y que por

---

[1] Ingreso de fomento industrial incluye:

(1) El ingreso neto derivado de la producción de un producto manufacturado que motiva la exención contributiva concedida al negocio.

(2) El ingreso derivado de la operación de hoteles turísticos y el 50% del ingreso de la operación de hoteles comerciales.

(3) El ingreso neto de propiedad dedicado a fomento industrial.

Art. 2, incisos (a) y (d) de la Ley de Incentivo Industrial de Puerto Rico de 1954 (13 L.P.R.A. sec. 242(a) y (d)) y Art. 2, incisos (a) y (d) de la Ley de Incentivo Industrial de Puerto Rico de 1963—Ley Núm. 57 de 13 de junio de 1963—(1 Servicio Legislativo de Puerto Rico, págs. 427 y 428).

tanto el recurrente viene obligado a pagar contribución sobre los mismos.

La prueba que desfiló fue presentada por el recurrente. El recurrido descansó en la presunción de corrección de sus determinaciones administrativas.

Stewart Krueger, antiguo empleado de Hickok Manufacturing Company, a cargo en Estados Unidos de una factoría de productos elásticos por lo que percibía un sueldo anual de $6,500, fue enviado a Puerto Rico en 1952 a establecer una fábrica de correas de cuero. Se le nombró gerente general de la misma con un sueldo igual al que ganaba en su anterior empleo. Estaba a cargo de seleccionar y entrenar el personal y de la manufactura y embarque del producto. Ni las ventas ni la contabilidad eran responsabilidad de Krueger. Dicha compensación no fue aumentada hasta el 1961 en que se le fijó un salario de $8,000 al año. Sus funciones y obligaciones no cambiaron básicamente entre 1952 y 1959. En su anterior empleo en Estados Unidos dirigía una fábrica de 125 empleados y los almacenes, mientras que en Puerto Rico sus responsabilidades eran menores, pues se trataba de una fábrica más pequeña, con embarques a un solo destino, o sea que toda la producción se vendía a un solo comprador. Aceptó venir a Puerto Rico bajo convenio con los señores de Hickok de que si decidía quedarse en Puerto Rico sería condueño de Hickok of Puerto Rico, Inc. A esta corporación le fue concedida exención contributiva en 1952 a tenor con las disposiciones de la Ley de Exención Industrial de Contribuciones de Puerto Rico de 1948 (13 L.P.R.A. secs. 221–251, ed. de 1955), según enmendada. En 1960 dicha corporación eligió la exención que se concede bajo las disposiciones de la Ley de Incentivo Industrial de Puerto Rico de 1954, de acuerdo con la Sec. 7 de la misma (13 L.P.R.A. sec. 247), y la correspondiente conversión de exención contributiva fue debidamente aprobada en 4 de noviembre de 1960. Según el testimonio de Krueger, no fue hasta diciembre de 1955 que *compró con*

*fondos propios* las 250 acciones denominadas "Special Class A", autorizadas por enmienda de 27 de diciembre de 1955 al Art. 4 del certificado de incorporación de Hickok, más 12 acciones de las 250 acciones comunes autorizadas por dicha corporación, pagando el valor a la par por ambas clases de acciones. Hickok también autorizó la emisión de 500 acciones preferidas con un valor a la par de $49 cada una y con derecho a un dividendo preferente de 6% por año, pero éstas luego de emitidas fueron redimidas. De acuerdo con el Art. 4 del certificado de incorporación de Hickok, dichas acciones "Special Class A", (a) no tenían derecho de voto; (b) tenían derecho a un dividendo igual al 5% de los beneficios netos totales de la corporación al último día del año fiscal que terminó en 31 de diciembre de 1955 dividido por 250, y por cada año fiscal subsiguiente comenzado con el año fiscal que comenzara en 1ro. de enero de 1957 a un dividendo igual al 5% de los beneficios netos aplicables hasta el cierre del año fiscal precedente dividido por 250; (c) disponía dicho artículo, además, que en adición a dicho dividendo, la junta de directores, a su absoluta discreción, podía pagar sobre las acciones "Special Class A" por cualquier año fiscal después del 31 de diciembre de 1955, aquellos dividendos adicionales que la junta de directores determinara; (d) la junta de directores podía en cualquier momento, de tiempo en tiempo, redimir todas o parte de las acciones "Special Class A" mediante el pago a su tenedor o tenedores de su valor a la par más cualesquiera dividendos anuales y dividendos especiales no pagados más cualesquiera dividendos adicionales declarados y no pagados; y (e) en caso de liquidación o disolución de la corporación, el tenedor de cada acción "Special Class A" tenía derecho a participar en el activo restante de la corporación después de pagarse el monto correspondiente a las acciones preferidas.

Las declaraciones de contribución sobre ingresos prepara-

das y radicadas por Hickok of Puerto Rico, Inc., y admitidas en evidencia demuestran lo siguiente:

| AÑO | BENEFICIO | PERDIDA | SOBRANTE |
|---|---|---|---|
| 1952 | | $19,905.51 | |
| 1953 | $29,312.26 | | $ 9,406.75 |
| 1954 | 48,634.39 | | 58,041.14 |
| 1954–55 (½ año) | 33,625.16 | | 91,666.30 menos $1,470 distribuido a accionistas 90,196.30 |
| 1955–56 | $47,420.88 | | 137,617.18 |

En enero de 1956 se declaró un dividendo sobre las acciones "Special Class A" de $6,986 más $1,176 sobre otras acciones lo que redujo el sobrante a ...... 129,455.18

| 1956–57 | | $38,929.88 | 90,525.30 |

Durante este año se pagaron $10,030 de dividendos, $8,854 sobre las acciones "Special Class A" y el remanente sobre otras, lo que redujo el sobrante a 80,495.30

| 1957–58 | $4,380.81 | | |

más otros ingresos de $22.28 menos $2,272.28 de distribución a accionistas, dejó un sobrante de ............................... 82,626.11

| 1958–59 (2) | $42,615.13 | | $125,241.24 |

menos $2,500 de dividendos pagados a Krueger ................................................... $122,741.24

El primer dividendo declarado sobre las acciones "Special Class A" en enero de 1956 se pagó en marzo de ese año. De acuerdo con el testimonio del contador público autorizado Ismael Rodríguez, todos estos dividendos se declararon en virtud de resoluciones al efecto aprobadas por la junta de directores de Hickok. El recurrente era y ha sido siempre un

---

(2) Con posterioridad a la declaración de ingresos correspondiente a este año fiscal, se le pagaron a Krueger $8,000 de dividendos adicionales, pues él incluyó en su declaración de ingresos correspondiente al año natural 1959 la suma de $10,500 de dividendos recibidos por él de Hickok.

tenedor minoritario de acciones votantes de Hickok, es decir, sólo ha sido dueño de 12 de las 250 acciones comunes votantes de dicha corporación.

En resumen, Krueger recibió de Hickok dividendos sobre las acciones "Special Class A" que adquirió de esa corporación en las cantidades de $6,986, $8,854, y $10,500 durante los años 1956, 1957 y 1959. Tales dividendos fueron debidamente declarados por la junta de directores de Hickok en consonancia con lo dispuesto al efecto por el Art. 4 del certificado de incorporación de Hickok y fueron pagados de los sobrantes acumulados por Hickok de sus operaciones exentas, reclamando Krueger, en tal virtud, que no tenía que pagar contribución sobre los mismos, de acuerdo con la Sec. 6 de la Ley de Exención Industrial de Contribuciones de 1948 (13 L.P.R.A. sec. 227, ed. de 1955).[3]

No conforme con la deficiencia de $8,427.25 que el recurrido le notificara basada en que los referidos pagos no eran dividendos sino salarios o compensación adicional por servicios prestados sobre los cuales no se puede reclamar exen-

---

[3] El inciso (d) del referido Art. 4 dispone lo siguiente:

"D. Each share of special class A stock outstanding at any time during the calendar year 1956 shall be entitled to a dividend (hereinafter referred to as the 'special dividend'), payable as and when declared by the Board of Directors, equal to 5% of the aggregate net earnings of the corporation as of the last day of the fiscal year ending December 31, 1955, divided by 250. For and during the fiscal year beginning January 1, 1957, and for and during each subsequent fiscal year, each share of special class A stock outstanding at any time during such fiscal year shall be entitled to a dividend (hereinafter referred to as the 'annual dividend'), payable as and when declared by the Board of Directors, equal to 5% of the applicable net earnings of the corporation as of the close of the last preceding fiscal year divided by 250, but only in the event that there are applicable net earnings at the close of said previous fiscal year.

. . . . . . . .

"In addition to the annual dividend payable as above provided, the Board of Directors may, in their absolute discretion, for and during any fiscal year subsequent to December 31, 1955, pay to the special class A stock such additional dividends (hereinafter referred to as 'additional dividends') as the Board of Directors may determine."

ción contributiva, demandó el recurrente al recurrido solicitando se dejase sin efecto dicha deficiencia. El recurrido contestó aceptando ciertos hechos alegados y negando en síntesis, que los pagos en cuestión fuesen dividendos. El tribunal de instancia, luego de determinar en parte los hechos antes relacionados y señalar que los pagos por concepto de dividendos ascendieron a $26,340 a base de una inversión de $250 concluyó que tales pagos fueron en realidad bonificaciones o compensación por los servicios del recurrente como gerente de la fábrica de elaboración de cueros y que éste no tenía derecho a reclamar exención alguna sobre las sumas así recibidas al amparo de la Sec. 22(a) de la Ley de Contribución sobre Ingresos de Puerto Rico, [4] y por último, que las deficiencias son válidas por lo que la acción del recurrente no debe prosperar.

 Señala el recurrente que el tribunal a quo incurrió en error al concluir que los referidos pagos fueron bonificaciones o compensación por sus servicios, descansando para ello exclusivamente en la presunción de corrección de las determinaciones del Secretario de Hacienda sin haber éste presentado prueba alguna para demostrar la corrección de sus determinaciones contributivas. Este apuntamiento se apoya únicamente en la doctrina que enunciamos en *Carrión* v.

---

[4] La Sec. 22(a), (13 L.P.R.A. sec. 3022(a)), dispone que:

"(a) Definición General.—'Ingreso bruto' incluye ganancias, beneficios e ingresos derivados de sueldos, jornales o compensación por servicios personales (incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico, de cualquier estado de la Unión, de los Estados Unidos, o de cualquier subdivisión política de los mismos, o de cualquier agencia o instrumentalidad de cualesquiera de las mencionadas entidades) de cualquier clase y cualquiera que sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedades, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias o beneficios e ingresos derivados de cualquier procedencia."

*Tesorero*, 79 D.P.R. 371 (1956), y reiteramos en *Ramón* v. *Secretario Hacienda*, 84 D.P.R. 440 (1962), y más tarde en *Reyes García* v. *Srio. de Hacienda*, 84 D.P.R. 596 (1962), al efecto de que en virtud de la referida presunción, el Secretario de Hacienda no tiene que presentar prueba alguna para demostrar la corrección de sus determinaciones contributivas, pero una vez se presente prueba creíble y razonable que sostenga las contenciones del contribuyente, dicha presunción desaparece y toca a dicho funcionario presentar evidencia de sus contenciones. Sobre el contribuyente recae la carga de persuadir al juzgador. Aunque la prueba de éste "no tiene que ser extraordinariamente persuasiva y fehaciente, ni clara ni robusta y convincente, debe por lo menos ser del grado y medida de persuasión que se exige en todos los demás casos civiles." *Collazo* v. *Srio. de Hacienda*, 82 D.P.R. 650, 656 (1961). A la luz de esta doctrina sostiene el recurrente que presentó prueba creíble, razonable y no rebatida de que Krueger era un accionista *bona fide* de Hickok, que los dividendos que se le pagaron fueron debidamente declarados y pagados de los sobrantes de dicha corporación, que se le vendieron acciones de Hickok a virtud de un entendido previo de que así se haría si él resolvía, como resolvió, permanecer en Puerto Rico.

El recurrido sostiene que el acuerdo entre Hickok y el recurrente para la adquisición de las acciones especiales constituye un contrato de empleo, y no de inversión *bona fide;* que la intención de Hickok al venderle acciones al recurrente fue concederle una compensación. Estas afirmaciones se basan en que los dividendos pagados sobre tales acciones constituyen un rédito irrazonable y excesivo en términos de la inversión; que la venta de acciones se realizó como un incentivo compensatorio para inducir a una persona de confianza y largos años de experiencia a trasladarse con su familia a Puerto Rico a establecer una industria nueva; que la irrazonabilidad del rédito pagado sobre las acciones

especiales se hace patente al compararse con el rédito provisto en el certificado de incorporación de Hickok con respecto a las acciones preferidas. Esta última observación no tiene gran peso en vista de las facultades tan amplias que la ley confiere a las corporaciones para crear y emitir toda clase de acciones con distintas clases de derechos, condiciones, beneficios y privilegios (14 L.P.R.A. secs. 1102 y 1501.)

La regla general es que la cuantía de dividendos a pagarse, y si deben o no declararse, son cuestiones que descansan primordialmente en la sana discreción de los directores. *Ballantine on Corporation,* Rev. Ed., sec. 231, pág. 552 y sec. 76, pág. 192 y casos allí citados. Pero a los efectos de determinar para fines tributarios si un pago constituye en realidad el pago de un dividendo o de una compensación, la intención de las partes es factor determinante. A esos efectos, las cortes no están limitadas a considerar la mera forma que se le ha dado al pago, sino que deben ir a la substancia de la cosa para precisar la verdadera naturaleza de la transacción en cuestión. Si bien es cierto que pagos hechos en cumplimiento de una obligación contractual pueden ser considerados como dividendos, según se indicó en *Beneficial Corporation* v. *Commissioner,* 18 T.C. 396 (1952, no es menos cierto que no todos los pagos que se hagan por tal razón son necesariamente dividendos, y, por lo tanto, esa base para pago no impide determinar, en un caso como el que nos ocupa, la naturaleza exacta de los pagos en controversia. De ahí que en *Albert Russel Erskine,* 26 B.T.A. 147 (1932), se considerase compensación la diferencia entre el precio a que una corporación adquirió un número de sus propias acciones en el mercado para venderlas a un ejecutivo suyo a un precio nominal en cumplimiento de un convenio celebrado con él como condición de su empleo. Se resolvió, además, en este caso que el pago al empleado de los dividendos pagados sobre estas acciones mientras estaban en la tesorería de la corporación también constituía compensación. En *Commissioner* v.

*Lo Bue*, 351 U.S. 243 (1956), se determinó que la diferencia entre el precio de $1,700 pagado por una persona a una corporación de la cual era empleado por acciones adquiridas bajo un plan de opción para adquirir tales valores, y el valor de tales acciones en el mercado ascendente a $9,930, constituía compensación por servicios personales y no una donación y debió incluirse como parte del ingreso del empleado a los efectos del pago de su contribución sobre ingresos. Se determinó que no existe disposición alguna en la Sec. 22 (a) de la Ley Federal de Contribución Sobre Ingresos ([5]) que limite su amplio ámbito debido a la intención de un patrono de lograr servicios más eficientes de un empleado dándole una participación en el negocio; que cuando se transfieren bienes por un patrono a un empleado para lograr mejores servicios, los mismos constituyen compensación, no importa que el pago se haga en acciones en vez de hacerse en efectivo; que el pago en este caso no podía considerarse como un donativo ya que no tenía la más leve característica de desinteresada generosidad, sino que se hizo con el propósito de lograr operaciones más lucrativas mediante un plan de proveer un incentivo a los empleados para promover el crecimiento de la empresa, consistente el incentivo en darle al empleado una participación en el éxito del negocio. En *United States Steel Corporation*, 2 T.C. 430 (1943), se consideraron como compensación adicional los dividendos pagados sobre acciones del patrono que éste acreditó al pago de tales acciones por su empleado bajo un plan titulado de suscripción de acciones, de acuerdo con el cual las acciones serían emitidas al empleado al pagarse la totalidad de su valor. Bajo dicho plan las suscripciones podían cancelarse y los pagos hechos, con excepción de los dividendos debían reembolsarse, a solicitud del emple-

---

([5]) La Sec. 22 (a) del Código de Rentas Internas Federal de 1939, 53 Stat. 9, según ha sido enmendado, 53 Stat. 574, define el ingreso bruto como "las ganancias, beneficios e ingresos derivados de . . . compensación por servicios personales . . . de cualquier clase y cualquiera que sea la forma en que se pagaren. . . ."

ado acogido al plan, al cesar éste en el empleo, al ser dejado cesante por causa o al dejar de reintegrarse al empleo cuando se le requiriese. El tribunal concluyó que el convenio en cuestión no era en realidad un contrato de suscripción de acciones; que en cuanto a la naturaleza de los pagos de dividendos, la intención de las partes es de primordial importancia; y que debe determinarse la sustancia del plan y no su forma y que bajo las circunstancias expuestas había que concluir que los pagos en cuestión constituían compensación adicional.

Los referidos casos de *Erskine, Lo Bue* y *United States Steel Corporation*, supra, son claramente distinguibles del que nos ocupa, pues en los dos primeros se trataba una cuestión enteramente distinta, o sea, la diferencia entre el precio en el mercado de las acciones y el precio a que éstas se vendieron a los empleados y en el tercero se trataba de dividendos pagados al empleado sobre acciones aún no emitidas a su favor y sólo sujetas a un llamado plan de suscripción de acciones que en realidad no era tal cosa, pues podía quedar sin efecto en cualquier momento.

■ El caso de *Paul E. Watson*, 60255 P-H Memo TC-1960 (vol. 29, pág. 1563), es parecido al que nos ocupa. En este caso la cuestión a determinar era si unos pagos hechos sobre acciones vendidas a unos empleados ejecutivos de una corporación ferrocarrilera, en parte por otros accionistas y en parte por la empresa directamente, y estando las acciones sujetas a compra por la corporación, por un precio fijado en el convenio cuando el status del ejecutivo como empleado cesase por muerte u otra causa, eran dividendos o compensación adicional. Se concluyó que los pagos en cuestión eran dividendos y no compensación adicional. La regla general citada en este caso es que la determinación de la naturaleza contributiva de pagos de dinero si constituyen donaciones, dividendos o compensación depende en gran parte de la verdadera intención de las partes, especialmente del pagador,

según se determine de los hechos y circunstancias relacionados con tales pagos. *Bogardus* v. *Commissioner*, 302 U.S. 34 (1937); *Neville* v. *Brodrick*, 235 F.2d 263 (1956); *Patent Button Co.* v. *Commissioner*, 203 F.2d 479 (1953). El tribunal en este caso llegó a la conclusión que los valores en cuestión eran acciones *bona fide*, que su venta a los ejecutivos empleados no era una farsa o ardid para pagar compensación adicional a empleados en forma tal que ellos pudiesen evitar el pago de contribuciones al distribuir los valores entre distintos familiares; por el contrario, la venta de las acciones a los empleados era *bona fide* con el propósito de que adquiriesen una participación en la corporación y no existía relación causal alguna entre los dividendos pagados y la determinación de la corporación con respecto a la compensación de estos empleados que previamente se había determinado era justa y razonable. (⁶).

En el caso ante nos, no se ha cuestionado la remuneración pagada al recurrente consistente de la suma de $6,500 al año. El fundamento aducido para sostener que los dividendos pagados al recurrente sobre las acciones "Special Class A" constituyen una compensación adicional es su cuantía consistente de un rédito promedio de $35 por dólar de inversión, siendo significativo que el recurrente era el único dueño de esa clase de acciones. Pero, si comparamos los sobrantes de Hickok con el número de acciones comunes emitidas se notará que el rédito promedio pagadero sobre éstas era alrededor de 29 veces su valor a la par y éstas no estaban sujetas a redención a la

---

(⁶) Véanse, además, el caso de *Neville* v. *Brodrick*, supra, y la anotación *Issuance or transfer of stock to corporate officer or employee as subject to federal income tax*, 72 A.L.R.2d 1329; Washington & Rothchild, *Compensating the Corporate Executive*, vol. 1, pág. 52 (3ra. ed.—The Ronald Press Company—1962); 4 Mertens, *Law of Federal Income Taxation*, secs. 25.64 a 25.68 (rev. 1960); Guterman, *Substance* v. *Form in the Taxation of Personal and Business Transactions*, N.Y.U. 20th Inst. of Fed. Tax. 951; *Phantom Stock Plans*, 76 Harv. L. Rev. 619; Hoffman, *Tax Influences in Shaping the Executive Pay Package*, 40 Taxes, 386.

par como lo estaban aquéllas. (⁷) Esta situación no es sorprendente, ni peculiar de este caso, sino que es indudablemente hija de dos circunstancias que pueden surgir en casos de empresas manufactureras en Puerto Rico que gozan de exención contributiva, o sea, que (1) pueden organizarse con un exiguo capital autorizado y proveerse del capital de operaciones adicional y necesario mediante la venta de acciones preferidas que luego se redimen como en este caso, o mediante préstamos gubernamentales de tipo promocional y (2) a través de buena administración consistente en manufactura eficiente y ventas ventajosas de toda su producción pueden obtener pingües beneficios libres de contribuciones aumentando así sus sobrantes en cantidades fuera de lo corriente.

▆ Ordinariamente, en un caso de una corporación no exenta podría argüirse que el haber creado una clase especial de acciones para un ejecutivo de la empresa en lugar de darle participación en la empresa a través de acciones de dividendos limitados como las preferidas o de acciones comunes (que a su vez le da participación no tan sólo en las ganancias sino también en los riesgos del negocio), es indicativo de la intención de tal corporación de pagarle compensación adicional por sus servicios. Hay una explicación, sin embargo, en los casos de corporaciones, como Hickok, que justifica la creación de tal clase especial de acciones y su emisión a determinada persona que es además empleado y accionista común de Hickok y que paga el importe completo de las mismas a dicha empresa según lo hizo Krueger. Se trata de una persona que no es un capitalista inversionista y que es residente *bona fide* en Puerto Rico. Los demás tenedores de las acciones comunes indudablemente son residentes en Esta-

---

(⁷) La tabla previamente transcrita, demostrativa de los beneficios, pérdidas y sobrantes de Hickok durante los siete años entre 1952 y 1958–1959, indica que el sobrante promedio durante los siete años en cuestión fue de más de $20,000. Toda vez que la inversión en acciones comunes ascendió a $500, el rédito promedio por dólar de inversión en tales acciones fue de unos $29.

dos Unidos continentales. De manera que a éstos no les conviene recibir periódicamente dividendos de Hickok porque tales pagos estarían sujetos a contribuciones tanto en Puerto Rico como en la residencia de los referidos accionistas.[8] Por lo tanto es indispensable para éstos, contrario al interés del recurrente, no recibir dividendos sobre las acciones comunes de Hickok sino, por el contrario, es imprescindible para ellos dejar que la ganancia de ésta se acumule[9] para en su oportunidad liquidarla o vender sus acciones por su valor aproximado al que tienen en los libros y así reducir su responsabilidad contributiva al pago de contribución sobre la ganancia de capital resultante. Obviamente, la tenencia de acciones preferidas con un dividendo sumamente limitado no hubiera dado cabal cumplimiento al convenio original de Krueger con Hickok al efecto de que aquél "podría ser condueño o recibir acciones de la compañía si yo me quedaba permanentemente." Situaciones como éstas son precisamente

---

[8] Bajo la Ley de Incentivo Industrial de Puerto Rico de 1954, la exención de dividendos está limitada a residentes *bona fide* de Puerto Rico, y a los no residentes que no vengan obligados a pagar en cualquier jurisdicción fuera de Puerto Rico contribución alguna sobre sus ingresos derivados de cualquier fuente en Puerto Rico. Una disposición similar se incluyó en la Sec. 6 de la Ley de Exención Industrial de Contribuciones de 1948, *supra*.

La Ley de Incentivo Industrial de Puerto Rico de 1963 incluye una disposición similar excepto que bajo esta ley se añade que en el caso de no residentes de Puerto Rico no se les cobrará contribución en Puerto Rico sobre dividendos o beneficios derivados de una corporación o sociedad que es un negocio exento en el Estado Libre (1) cuando no puedan tomar como deducciones del ingreso o como crédito contra la contribución pagadera en el país de su residencia los referidos dividendos o beneficios y (2) en el caso que sólo los puedan tomar parcialmente como tal deducción o crédito, entonces la exención de dividendos sólo cubrirá aquella parte de la contribución imponible en Puerto Rico sobre los referidos dividendos o beneficios que sea deducible o acreditable en el país donde residen los accionistas. 13 L.P.R.A. sec. 243(a)(1) y (2). Sec. 3(a)(1), (2), (3) y (4) de la Ley Núm. 57 de 13 de junio de 1963, *supra*, (escolio 1).

[9] La acumulación de ganancias es permisible en el caso de corporaciones exentas de contribuciones bajo las disposiciones de las leyes citadas en el escolio 8. Esto se aclaró definitivamente por virtud de la Ley Núm. 58 de 17 de junio de 1963 (1 Servicio Legislativo de P.R. 461).

360

las que pueden anticiparse sin que estén reñidas con los amplios y beneficiosos propósitos de la legislación que desde el 1947 provee exención contributiva a determinadas empresas y en particular a determinadas operaciones manufactureras. De acuerdo con la Exposición de Motivos de la Ley de Exención Industrial de Contribuciones de 1948 antes citada, uno de los propósitos que tuvo la Asamblea Legislativa al aprobarla ha sido "Para la más eficiente utilización de nuestros recursos humanos, para el más fructuoso aprovechamiento de nuestros limitados recursos naturales, para garantizar a nuestras masas trabajadoras amplias oportunidades de trabajo, para remediar el desempleo que nace de la imposibilidad de nuestra agricultura para absorber todos los brazos disponibles, es necesario que el Gobierno de Puerto Rico se apreste a librar la batalla de la producción *proporcionando a individuos y entidades incentivos y facilidades que hagan comercialmente atractivo tanto el establecimiento de nuevas industrias en Puerto Rico como el desarrollo de las que ya vienen funcionando aquí con posibilidades de expansión.*" (Énfasis nuestro.) (13 L.P.R.A. sec. 221, ed. 1955.)

▬ En la exposición de motivos de la Ley de Incentivo Industrial de 1954 informó la Asamblea Legislativa que ". . . en las fases industriales y de turismo del programa de fomento económico se ha utilizado como medio indispensable de promoción el incentivo que a los inversionistas y manufactureros ofrecen los beneficios de la exención contributiva industrial que la Legislatura de Puerto Rico dispuso se concedieran bajo la Ley Núm. 184 de Mayo 13, 1948, . . . según ha sido enmendada hasta la fecha, con el resultado de que bajo dicho programa se ha proporcionado empleo directo a más de 20,000 trabajadores en empresas de manufactura y de turismo, proporcionándose empleo, además, a un número igual adicional de personas en otras actividades como, por ejemplo, en los servicios necesarios de transportación, comunicaciones, en los negocios y en las profesiones." 13 L.P.R.A.

sec. 241 nota. Véase, escolio 8 de *Elgee, Inc.* v. *Srio. de Hacienda*, 88 D.P.R. 415 (1963.) Evidentemente no era suficiente proveer el incentivo consistente de eximir las ganancias de las corporaciones y sociedades para lograr el establecimiento de nuevas y adicionales empresas manufactureras y hoteleras, sino que había que proveer incentivo similar a los individuos residentes en el país, por tres razones fundamentales, o sea, para inducirlos a establecer tales empresas por su cuenta, para hacer inversiones de capital en ellas y, no menos importante, para lograr, como es evidente en el caso que nos ocupa, que personas con los conocimientos y la experiencia necesaria se trasladasen al país a establecer y dirigir operaciones desconocidas aquí hasta entonces y así transmitir sus conocimientos y su técnica a cientos de jóvenes puertorriqueños hábiles y ávidos de adquirirlas. Las empresas industriales no son meras máquinas automáticas que trabajan por sí solas. Es el talento y la experiencia del hombre que las inicia, desarrolla y las dirige y les provee y asegura su operación exitosa y cuando en un país no desarrollado no los hay, hay que buscar la manera de atraerlos de afuera. En el estado contributivo prevaleciente en un sistema de libre empresa como el nuestro, hemos comprobado que un medio efectivo de lograr esto ha sido a través de la utilización de la exención de contribuciones prevaleciente en Puerto Rico [10] por el programa de desarrollo económico autorizado por la

---

[10] La comprobación más elocuente de los resultados positivos obtenidos bajo dicho programa surge de las siguientes estadísticas:
1) El ingreso promedio en Puerto Rico ha aumentado de $150 a $700 desde el comienzo del programa.
2) Se han establecido unas 900 fábricas bajo dicho programa, habiéndose invertido unos $770 millones de dólares de capital privado y $62 millones de dólares de fondos gubernamentales para lograrlo.
3) Dichas fábricas proveen empleo directo e indirecto a unas 120,000 personas con una nómina anual de $175 millones de dólares. Cita: Informe Anual de 1962 de la Compañía de Fomento Industrial de Puerto Rico, pág. 5 y Sunday San Juan Star Magazine, 13 de octubre, 1963, pág. 6.

Legislatura y el Poder Ejecutivo del Estado Libre Asociado, supervisado por este último y dirigido por la Administración de Fomento Económico y su subsidiaria la Compañía de Fomento Industrial de Puerto Rico, a promover agresivamente el establecimiento de empresas manufactureras en este país. Concluimos, por lo tanto, que la presunción de corrección de la determinación del Secretario de Hacienda en este caso desapareció al presentarse, como se presentó, prueba creíble y razonable por el recurrente que sostiene su contención al efecto de que los pagos impugnados constituyen dividendos y no compensación.

*Por los motivos indicados se revocará la sentencia en este caso, y en su lugar se dictará otra declarando con lugar la demanda y en su consecuencia se anulan las deficiencias que se impugnan en la querella.*